FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★  MAR 3 0 2011  ★

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN R. RICONDA, | ) Case No. _____  **LONG ISLAND OFFICE** |
| Plaintiff, | ) Judge _____ |
| v. | ) |
| MARC SHERMAN, EDWARD L. CUMMINGS, ROBERT W. VAN HELLEMONT, R. KEITH ELLIOTT, JOHN F. CUNNINGHAM, AND GEOFF SMITH, | ) **CV 11 1556** |
| Defendants. | ) **SEYBERT, J.** |
| | ) **BOYLE, M.** |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§1332, 1441 and 1446, Defendants Marc Sherman ("Sherman),

Edward L. Cummings ("Cummings"), Robert W. Van Hellemont ("Van Hellemont"), R. Keith

Elliott ("Elliott"), and Geoff Smith ("Smith") (collectively "Defendants") hereby remove this

action from the Suffolk County, New York Supreme Court to the United States District Court for

the Eastern District of New York. The grounds for removal are as follows:

1. On or about February 25, 2011, Plaintiff John R. Riconda ("Plaintiff") filed a
complaint, captioned John R. Riconda v. Marc Sherman, et al. and bearing the index number
006678/2011, in the Suffolk County, New York Supreme Court. A true and accurate copy of
that complaint is attached hereto as Exhibit A. On March 1, 2011, Defendants Cummings,
Smith, and Elliot received service of the complaint. On March 3, 2011, Defendant Sherman
received service of the Complaint. On March 5, 2011, Defendant Van Hellemont received
service of the Complaint.[1]

2. Plaintiff is a citizen and resident of New York. (See Ex. A, Compl. ¶23.)

3. Defendants Sherman and Elliott are citizens and residents of Florida.

---

[1] According to the online docket, named defendant John F. Cunningham has not, as of the date of this filing, been
served with the Summons and Complaint in this action.
{2636342:2}Riconda_v[1][1]._Sherman%2c_et_al._--_Notice_of_Removal_(2636342-2)

4.    Defendant Cummings is a citizen and resident of New Jersey.

5.    Defendant Van Hellemont is a citizen and resident of Michigan.

6.    Defendant Cunningham (who, according to the online docket has not been served with the Summons and Complaint) is a citizen and resident of Pennsylvania.

7.    Defendant Smith is a citizen and resident of Ohio.

8.    Through his complaint, Plaintiff seeks to recover $2,572,602 in damages, exclusive of interest and costs, based on his claims for alleged breach of fiduciary duty, breach of duty of loyalty, and fraud. (See Ex. A.)

9.    Because this civil action is between citizens of different states and because the amount in controversy exceeds the sum or value of $75,000 exclusive of interests and costs, this Court has original jurisdiction pursuant to 28 U.S.C. §1332. Accordingly, this matter is removable to this Court pursuant to 28 U.S.C. §1441.

10.   Defendants have filed this Notice of Removal within 30 days after they received service of process. This Notice of Removal is, therefore, timely filed pursuant to 28 U.S.C. §1446.

11.   Defendants will promptly file a copy of this Notice of Removal with the Clerk of Court of the Suffolk County, New York Supreme Court as required by 28 U.S.C. §1446(d).

12.   Defendants expressly reserve the right to object on the bases of lack of personal jurisdiction and inconvenient forum.

Respectfully submitted,

By: _____
Richard A. Kraslow, P.C. (RK0925)
425 Broad Hollow Road, Suite 206
Melville, New York  11747
Phone: (631) 756-8300
Email: rakpc1@aol.com

2

{2636342:2}

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

| | |
|---|---|
| JOHN R. RICONDA,<br><br>        Plaintiff,<br><br>        -against-<br><br>MARC SHERMAN, EDWARD L. CUMMINGS,<br>ROBERT W. VAN HELLEMONT, R. KEITH<br>ELLIOT, JOHN F. CUNNINGHAM, AND GEOFF<br>SMITH,<br><br>        Defendants. | Index No. 001678/2011<br><br><br>**COMPLAINT** |

Plaintiff John R. Riconda ("Plaintiff" or "Riconda"), by and through his attorneys

Kelley Drye & Warren LLP, as and for his Complaint against Defendants Marc Sherman,

Edward L. Cummings, Robert W. Van Hellemont, R. Keith Elliot, John F. Cunningham and

Geoff Smith (collectively "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.       This action arises out of audacious acts of fraud, self-dealing and breach of

fiduciary duty by the Defendants, who were the directors and officers of QSGI, Inc. and QSGI-

CCSI, Inc. (collectively, "QSGI") – two Florida-based public companies that are now Debtors in

a Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of

Florida.

2.       Defendant Marc Sherman was QSGI's Chairman and Chief Executive Officer.

Sherman is the target of an investigation by the Securities Exchange Commission (the "SEC") in

connection with his filing of false 10Q forms and other documents, on QSGI's behalf, as well as

other wrongdoing.

3.       John Riconda is the President, Chief Executive Officer and owner of

Contemporary Computer Services, Inc. ("CCSI"), a New York corporation headquartered in Bohemia, New York, and a shareholder of QSGI.

4.      In July 2008, John Riconda consummated a transaction with QSGI in which Riconda, as seller, agreed to sell the stock and assets of CCSI to QSGI, as buyer, in exchange for, among other consideration: (i) a $10 million, 10% convertible note (the "Note"); and (ii) 3.5 million shares of QSGI common stock.  To collateralize the Note, QSGI placed 100% of the capital stock of CCSI in escrow, pursuant to a Pledge and Escrow Agreement dated July 7, 2008.

5.      As a direct consequence of the Defendants' misconduct, the transaction went awry immediately following closing, causing massive injury to Riconda.  Initially, at Defendants' direction, QSGI refused to pay John Riconda the very first $250,000 interest payment under the Note, which was due on August 1, 2008, only twenty-two days after the deal's closing on July 7, 2008.[1]  See ¶ 61, below (quoting from the First Amendment to the Stock Purchase Agreement between QSGI and John Riconda, dated July 7, 2008).  Ultimately, at the Defendants' direction, QSGI failed to pay John Riconda any money – pursuant to the Note or otherwise – in exchange for the company it "bought" (i.e., CCSI).

6.      In addition, QSGI refused to pay at least $120,000 in legal fees to John Riconda's attorneys, which it had promised to pay by July 31.  See ¶ 63, below (quoting from the First Amendment to the Stock Purchase Agreement between QSGI and John Riconda, dated July 7, 2008).

7.      To make matters worse, immediately following the closing of the QSGI - CCSI acquisition, QSGI – as directed by the Defendants – entered into a financing transaction with

---

[1] Upon QSGI's default on its quarterly payment obligation to John Riconda, the interest rate under the Note escalated to 15%, causing QSGI's monthly payment obligation to rise to $375,000 per quarter.

2

non-party Victory Park Management LLC ("Victory Park"), a Chicago-based entity that provides asset-backed financing to small and mid-cap companies. The Victory Park financing allowed QSGI to draw down funds against a defined "borrowing base" consisting of QSGI's monthly receivables and inventory. In order to secure the loan, QSGI pledged "all" of its assets to Victory Park, including the newly-acquired stock and assets of CCSI. As a result of QSGI's pledge, Victory Park claimed a first position lien on the assets of CCSI and a second position lien on the stock of CCSI.

8.      In approximately June 2009, it became clear that Defendants and QSGI had no intention or ability to pay John Riconda for CCSI, under the Note or otherwise. Accordingly, John Riconda notified the escrow agent holding the stock of CCSI that QSGI had defaulted on its payment obligations, and demanded that the stock of CCSI be returned to him. Without any basis in fact or legal justification, the Defendants disputed QSGI's default and forced Riconda to spend hundreds of thousands of dollars in legal fees, and more than a year in litigation, to reclaim his company. Ultimately, on June 24, 2010, John Riconda and QSGI reached a settlement, which was approved by the Bankruptcy Court, and in which, in part, Riconda waived the right to receive distributions from QSGI's bankruptcy estate in exchange for QSGI's agreement to authorize the escrow agent to deliver to him the stock of CCSI free of any claimed lien or other encumbrance by QSGI. For reasons explained herein, that settlement fell far from making John Riconda whole.

9.      For its part, Victory Park objected to the return of CCSI to John Riconda because QSGI had pledged CCSI's assets to Victory Park as part of the financing transaction, and – at the time Riconda took steps to reclaim CCSI in June 2009 – QSGI owed in excess of $6 million in

3

unpaid loans to Victory Park, which it had no apparent ability to repay. Victory Park claimed the right to foreclose on CCSI's assets in order to repay itself for the outstanding loans it had made to QSGI.

10.     As a consequence, John Riconda was forced to spend over a year litigating with Victory Park in federal and state courts in New York, Illinois and Florida, and to spend hundreds of thousands of dollars on legal fees, in order to reclaim CCSI free and clear of the claimed lien by Victory Park. Ultimately, Riconda reached a settlement with Victory Park pursuant to which.

11.     Defendants' are personally liable for John Riconda's losses, as directors and officers of QSGI, because they engaged in manifest fraud, which is set forth with particularity below, in persuading John Riconda to sell CCSI to QSGI.

12.     Defendants are also personally liable for John Riconda's losses, as directors and officers of QSGI, because they subsequently committed additional acts of fraud, self-dealing and breach of fiduciary duty to John Riconda, both as a Pledgee under the Pledge and Escrow Agreement of July 7, 2008, and as a shareholder of QSGI.

13.     Defendants' personal misconduct included but was not limited to:

> • Making intentionally false and fraudulent statements to John Riconda to the effect that (i) QSGI was on the precipice of profitability due to the impending receipt of contracts with specific major corporations (it was not); (ii) QSGI had sufficient financing available from Victory Park to meet its contractual closing obligations to John Riconda (it did not); (iii) the Victory Park financing was sufficient to enable QSGI to meet its payment obligations to John Riconda under the Note (it was not); and (iv)

4

the Victory Park financing would enable QSGI to pursue an ambitious and

profitable growth plan though additional corporate acquisitions (the

Victory Park financing was not sufficient to pursue an ambitious growth

plan); and

- Submitting numerous false and fraudulent filings to the SEC – which

  Defendants Sherman and Cummings certified under oath, and the other

  Defendants prepared, reviewed and/or otherwise approved – inflating the

  value of QSGI's inventory by millions of dollars.

14.     John Riconda relied on the Defendants' false statements in agreeing to enter into

and consummate the sale of CCSI to QSGI. John Riconda also relied on QSGI's inaccurate SEC

filings in agreeing to enter into that transaction. The bogus filings appeared to John Riconda to

support the Defendants' claims concerning the financial stability of QSGI.

15.     Likewise, non-party Victory Park relied on Defendants' false SEC filings in (i)

closing the financing transaction with QSGI, and (ii) in permitting QSGI to draw down funds

over time, following the execution of the financing transaction documents. Every time QSGI

drew down money under the Victory Park financing – which Defendants facilitated by preparing

borrowing base calculations for Victory Park showing inflated inventory, and submitting falsified

SEC filings to "support" those inflated figures – CCSI's stock and assets, which had been

pledged to John Riconda as collateral for his Note, were further encumbered and devalued,

causing injury to John Riconda.

16.     Defendants had a duty to John Riconda, as a Pledgee under the Pledge and Escrow

Agreement of July 7, 2008, to protect the value of the collateral pledged to him, which they

5

wantonly breached.

17.     Defendant Sherman also breached his fiduciary duty, including his duty of loyalty, to QSGI and its shareholders, including John Riconda, by buying used computers for resale by QSGI at an inflated price from a company called the Keystone Memory Group, which was owned in whole or part by Sherman's sister, at a massive loss to QSGI. The used computers Sherman purchased from Keystone Memory Group were principally resold, after refurbishment, to a company known as Tiger Direct, which purports to sell used personal desktop and laptop computers to online consumers at bargain basement prices directly from the tigerdirect.com website.

18.     Astonishingly, in an email dated July 1, 2008, Sherman had stated to John Riconda that, "you have my word that we will exit the resale business that is not related to data security." See ¶ 44, below. But Sherman did exactly the opposite. Far from exiting the refurbishment and resale business, Sherman borrowed hundreds of thousands – if not millions – of dollars from Victory Park, between fall 2008 and June 2009, for the purpose of increasing QSGI's involvement in the refurbishment and resale market. On information and belief, Sherman increased QSGI's involvement in the resale and refurbishment business, despite the massive losses to QSGI, because Sherman's sister – and, upon information and belief, Sherman personally – was enriched by the transactions.[2]

19.     Sherman also breached his fiduciary duty to QSGI and its shareholders, including John Riconda, by paying himself an astronomical salary of approximately $420,000 per year

---

[2] Although Sherman took pains to conceal the expanding refurbishment and resale, QSGI's Form 10-K/A of July 10, 2010 – which was filed after the Chapter 11 filing, and which set forth amended and restated financial information for 2008 – disclosed the existence of a transaction involving Keystone Memory Group, which had a principal related to Sherman. That principal was Sherri Sherman Sheerr, Sherman's sister.

while QSGI was losing money and rapidly approaching Chapter 11.

20.     The other Defendants, as directors and officers of QSGI, breached their fiduciary duties to QSGI and its shareholders, including John Riconda, by (i) failing to prevent Sherman from expanding the refurbishment and resale business with Keystone Memory and Tiger Direct, which enriched Sherman personally, at the expense of QSGI and its shareholders; and (ii) approving Sherman's outsized compensation at the same time he was driving QSGI into the ground.

21.     Inasmuch as all of the Defendants owed a special fiduciary duty to John Riconda as the pledgee under the Pledge and Escrow Agreement dated July 7, 2008, they breached that duty, causing John Riconda injury, through the foregoing action (and inaction). QSGI's downward spiral, and its skyrocketing debt to Victory Park, were a consequence of the Defendants' misconduct, and directly impaired the value of John Riconda's collateral under the Pledge and Escrow Agreement of July 7, 2008, i.e., the stock and assets of CCSI.

22.     In this action, John Riconda seeks (1) an award of actual and consequential damages including, but not limited to: (i) repayment of the settlement amount paid to Victory Park in exchange for Victory Park's relinquishment of its claimed first lien on CCSI's assets which will be disclosed under seal at trial; (ii) at least $700,000 in legal, accounting and other professional fees incurred during the negotiation of the sale of CCSI to QSGI and, subsequently, in litigation with QSGI and Victory Park; and (iii) approximately $1,372,602 million in unpaid interest payments withheld from John Riconda between July 2008 and June 2009, during which period QSGI purported to own CCSI; (2) an award of punitive damages against the Defendants based on the gravity of Defendants' misconduct; and (3) such other and further relief as the Court

7

deems just and proper.

## PARTIES

23.    Plaintiff John Riconda is an individual residing at 130 Soundview Terrace, in Northport, New York.[3]

24.    Defendant Marc Sherman is an individual residing at 241 Tradewinds Drive, Palm Beach, Florida 33480.  Sherman was the President and Chief Executive Officer of QSGI, and a member of its Board of Directors, from 2001 to present.

25.    Defendant Edward L. Cummings is an individual residing at 116 Bortons Road, Marlton, New Jersey 08053.  Beginning in 2001, Cummings served in a variety of executive positions for QSGI, including Chief Financial Officer, Treasurer, Controller and Vice President of Finance.

26.    Robert W. Van Hellemont is an individual residing at 1000 Shirley Road, Birmingham, Michigan, 48009. Van Hellemont was a member of the Board of Directors from 2004 until July 7, 2009.

27.    R. Keith Elliot is an individual residing at 249 Tradewind Drive, Palm Beach, FL 33380.  Elliott was a member of the QSGI Board of Directors until February 27, 2009.

---

3  Although CCSI is not a party hereto, it is a New York corporation with its principal place of business at 200 Knickerbocker Avenue, Bohemia, New York. CCSI provides maintenance services for mainframe and mid-range processors, enterprise class tape storage and peripherals, and also performs network design, implementation, and monthly networking infrastructure maintenance services for corporations and governments, as well as 24/7 IT monitoring and diagnostics.

28.     John F. Cunningham is an individual with an address at c/o Federated Investors, Inc., 1001 Liberty Avenue , Pittsburgh, Pennsylvania 15222. Cunningham was a member of the Board of Directors of QSGI from 2005 to 2008.[4]

29.     Geoff Smith, is an individual residing at 5445 Miami Road, Cincinnati, Ohio 45243. Smith was a member of the Board of Directors from 2005 to July 7, 2009.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over this action pursuant to CPLR 302(a)(3) and venue is proper pursuant to CPLR 503(a), because John Riconda resides in Suffolk County.

## FACTUAL ALLEGATIONS

31.     CCSI, which is headquartered in Bohemia, NY, in Suffolk County, has been in existence since 1974, and presently employs over 75 individuals. John Riconda has been CCSI's President and CEO since 1996. John Riconda has lived in Suffolk County since 1963.

A.     **QSGI Agrees To Acquire CCSI**

32.     Defendant Marc Sherman initially contacted John Riconda concerning a potential acquisition, through a non-party investment banker, in or around April 2007. Sherman claimed that, although QSGI had experienced a multimillion dollar loss in the third quarter of 2007, it was poised to break even in the fourth quarter by making cuts in the unprofitable refurbished computer resale business. However, QSGI again posted another massive loss in the fourth quarter of 2007, and discussions between Sherman and Riconda broke off.

33.     Sherman reached out to John Riconda again during the second quarter of 2008. Again, Sherman claimed that despite posting massive losses in the first quarter of 2008, QSGI

---

4 On April 18, 2008, QSGI received notification that John F. Cunningham had tendered his resignation from the Board of Directors. Cunningham was Chairman of the Corporate Governance Committee and a member of the

9

was on the brink of profitability because it had procured contracts with major companies including IBM, ADP, American Express, Morgan Stanley and The Hartford, which would yield substantial revenue.

34.     Negotiations between Riconda and QSGI (and their respective counsel) for the sale of CCSI commenced in earnest during the second quarter of 2008. Riconda afforded QSGI full access to CCSI's books and records, including bank records, balance sheets, independent auditors' reports and other key documents. Riconda, as seller of the target company, was not given access to QSGI's books and records, although Riconda and his counsel had access to QSGI's public SEC filings.

35.     The initial deal offered by Sherman, on QSGI's behalf, contemplated the purchase of CCSI from John Riconda for a $10 million cash payment. Over the course of the negotiations, however, QSGI took back the all cash offer, and substituted an offer based on a $10 million, 10% promissory note, plus QSGI stock, which Sherman claimed would be more valuable to John Riconda over time than the cash deal. The promissory note, and QSGI's payment obligations, were to be securitized by the stock and assets of CCSI, which would be placed in escrow, and which Riconda would be able to reclaim in the event of a default by QSGI under the promissory note.

36.     On May 6, 2008, QSGI and John Riconda executed a Stock Purchase Agreement, which annexed a draft $10 million, 10% promissory note that would be executed in John Riconda's favor upon the closing the closing of the planned transaction. Pursuant to the terms of the May 6, 2008 Stock Purchase Agreement and the draft promissory note, Riconda was to retain

---

Compensation Committee.

a priority lien on both the stock and assets of QSGI (i.e., to secure QSGI's payment obligations), which QSGI agreed to put in escrow.

**B.     QSGI Makes A Financing Deal With Victory Park And Defendants Fraudulently Induce Riconda To Agree To Modified Terms For The QSGI – CCSI Deal**

37.     In or around June 2008, QSGI entered into a financing agreement with Victory Park that contemplated a factoring loan arrangement of up to $10 million.  Under the terms of the loan, QSGI would be able to draw down funds over time in amount keyed to a monthly borrowing base consisting of QSGI's inventory and receivables; the higher QSGI's inventory and receivables were, the more cash it could draw down under the financing arrangement with Victory Park.

38.     To induce Victory Park to enter into the financing transaction, Sherman and the other Defendants, on QSGI's behalf, afforded Victory Park access to QSGI's books and records, including bank records, balance sheets and inventory and receivables information.  Upon information and belief, the information furnished to Victory Park relating to QSGI's inventory and receivables was inflated and untrue.  Further, as part of its due diligence process, Victory Park was provided with, and reviewed, QSGI's SEC filings, which, as set forth with specificity below, also contained falsely inflated inventory values.  Upon information and belief, Victory Park relied upon the false inventory figures contained in QSGI's SEC filings in agreeing to provide financing to QSGI.

39.     Unbeknownst to John Riconda, Victory Park also told Defendant Marc Sherman, in or around June 2008, that it would not close on the financing transaction until after the acquisition of CCSI was completed, so that QSGI could pledge CCSI's assets to Victory Park as

11

collateral for the contemplated loan. Victory Park also insisted that any lien Riconda retained on the assets of CCSI be subordinated to the lien QSGI would be giving to Victory Park.

40.    Following QSGI's execution of the June 2008 financing agreement with Victory Park, Sherman contacted John Riconda and insisted that certain amendments be made to the May 6, 2008 Stock Purchase Agreement.

41.    Among the modifications demanded by Sherman was the subordination of John Riconda's priority lien on the assets of CCSI (i.e., as collateral for QSGI's payment obligations to John Riconda under the Note) to a first lien in favor of Victory Park. Sherman insisted that Riconda execute a subordination agreement with Victory Park reflecting that modification.

42.    Riconda was hesitant to modify the terms of the deal, but he ultimately agreed to do so in reliance upon certain specific false and fraudulent statements made to him by Defendant Marc Sherman.

43.    First, on June 10, 2008, Defendants filed a form 8-K filing with the SEC claiming that that details QSGI's planned shift its business focus toward "reoccurring, higher margin IT services." In fact, Sherman and the other Defendants had no intention of exiting the unprofitable computer refurbishment and resale business and reorienting QSGI towards a model focused exclusively on recurring revenue IT services. To the contrary, Sherman intended to expand the refurbishment and resale business involving Keystone Memory Group and Tiger Direct because it benefited him and his sister personally, supporting Sherman's lavish lifestyle, including his membership the exclusive Breakers Country Club, in Palm Beach.

44.    Sherman's intentional false and fraudulent statements to John Riconda, also included, but were not limited to the following:

- In an email dated June 20, 2008, Marc Sherman stated to John Riconda that QSGI needed to close the CCSI transaction before the end of the second quarter so that QSGI would be able to account for all transaction expenses during that quarter, and thereafter "have a clean 3rd quarter and show profitability." In fact, Sherman knew that in view of QSGI's millions of dollars in remaining indebtedness, and the fact that various QSGI divisions were operating at a massive net loss – realities which were concealed from John Riconda – it would be impossible for QSGI to post a profitable third quarter. Sherman and the other Defendants were also aware that the Company's SEC filings contained false and inflated inventory figures, which skewed the Company's balance sheet, such that QSGI was in no position to show an actual profit even if they could make the company look profitable on paper;

- In an email dated July 1, 2008, less than a week prior to closing, Sherman promised to make monthly note payments to John Riconda in the amount of $83,333, instead of quarterly payments under the note of $250,000. In fact, Sherman knew that (a) Victory Park, as senior lender, would not permit monthly payments in lieu of quarterly payments, and (b) that QSGI, based on its then-existing financial condition, had, and would have, no conceivable means of making such payments. Sherman also knew that QSGI would be drawing down funds on its Victory Park loan by showing Victory Park a borrowing base calculation that included fabricated inventory and receivables figures, and accordingly had actual knowledge that QSGI could not satisfy its financial commitments to John Riconda, or pay back the loans it would be taking, which were backed by collateral also pledged to John Riconda.

13

- In the same email, dated July 1, 2008, Sherman stated to John Riconda that Sherman intended to make Riconda the Chief Operating Officer ("COO") of QSGI. This promise was of crucial importance to Riconda because he had previously discussed with Sherman that, as COO, he could assist QSGI in making QSGI's Data Center Maintenance group profitable, using his operational expertise. In fact, Sherman never intended to make Riconda the COO of QSGI, and never took steps to do so.

- In the July 1, 2008 email, Marc Sherman also stated to John Riconda that, "you have my word that we will exit the resale business that is not related to data security." John Riconda had previously expressed his concern to Sherman that QSGI's refurbished computer sales business could not be profitable because it tied up excessive amounts of operating cash. In fact, Mr. Sherman never intended to exit that line of business, and QSGI continued expanding its refurbishment and resale operation through its Chapter 11 filing for his own personal pecuniary benefit.

- In an email dated July 2, 2008, Sherman stated to John Riconda that "we [QSGI] will set up an advisory committee that reports to me as chairman and the board." (Sic) Sherman described the purported committee as including "John R (Head of the committee) .. so this will give you direct reporting to the board at meetings and you will be a part of the overall decision making.." (typographical errors in original). In fact, Sherman never intended to constitute an advisory committee giving John Riconda strategic or operational input into the combined company, and never did so.

- In an email dated July 3, 2008, Sherman told John Riconda that QSGI could not make monthly (as opposed to quarterly) note payments because Victory Park would not

14

allow such a modification to the terms of the note, but that Victory Park "had no problem" with QSGI's making $250,000 quarterly payments under the Note, which was simply false (i.e., pursuant to the terms of the QSGI – Victory Park financing transaction, Victory Park had not given Sherman or QSGI permission to make $250,000 quarterly Note payments to John Riconda irrespective of cash availability pursuant to the agreed upon borrowing base).  Sherman also told John Riconda that Victory Park had no problem with QSGI's making the $170,000 payment for legal fees incurred but John Riconda in connection with the transaction (with $50,000 to be paid upon closing and the balance of $120,000 to be paid several weeks thereafter), which was also false.

45.     In reliance upon these and other false and fraudulent statements, and in reliance upon the false and fraudulent information contained in QSGI's public SEC filings, John Riconda agreed to go forward with the sale of CCSI to QSGI upon the modified terms demanded by Sherman.  The modified terms were memorialized in a set of transaction documents dated as of July 7, 2008 – a set of agreements that Defendants did not honor, and never intended to honor.

**3.      Defendants Show False Inventory Figures To Draw Down Millions of Dollars Under The Victory Park Financing, Encumbering John Riconda's Collateral**

46.     The Defendants wasted no time in worsening the situation after the QSGI – CCSI deal closed.  Immediately following the closing of the CCSI acquisition, QSGI closed the planned financing transaction with Victory Park and began drawing down millions of dollars in loans secured by CCSI's stock and assets.

47.     In order to draw down the funds within the parameters of the borrowing base

15

agreement with Victory Park, Defendants fabricated monthly calculations which included inflated inventory values and fake receivables, and provided those calculations to Victory Park. The false inventory figures were "supported" by massively inflated inventory figures reported in QSGI's Form 10Q and other public SEC filings.

48.     The inflated inventory values QSGI was reporting to the public are most starkly reflected in the sudden, unexplained "drop" in inventory value in the months preceding, and immediately following, the Chapter 11 filing, during the spring and summer of 2009. Specifically, in its 10Q for the first quarter of 2009, which was filed on May 10, 2009, QSGI reported inventory valued at $4,807,404. Less than three months later, following its Chapter 11 filing, an independent restructuring consultant hired by the bankruptcy estate reported an inventory value of a paltry $499,473, on a QSGI Balance Sheet dated July 31, 2009.[5]

49.     QSGI showed no massive sales spike or any other information that would credibly explain the drop in inventory of more than $4.3 million in a period of approximately two and a half months. This is because there was no credible explanation; Defendants had been lying about the value of QSGI's inventory in public filings for years.

50.     In fact, on May 4, 2009 – only 6 days before the filing of the first quarter 2009 10Q – Andy Kerr, the executive in charge of QSGI's Eagan, Minnesota operation, sent an email to Sherman and others stating that QSGI's inventory at the Eagan, Minnesota facility – which comprised a substantial portion of QSGI's overall inventory – was worth, "at most $150,000."

---

[5]  In its initial Chapter 11 Petition, which was filed with the United States Bankruptcy Court for the Southern District of Florida on July 2, 2009, QSGI stated that the value of its inventory was $1,131,681, as of the petition date. Even assuming that this figure was truthful, which upon information and belief it was not, it would mean that QSGI's inventory dropped approximately $3.7 million in value in approximately six weeks. The absence of any explanation for the drop-off (i.e. such as a sudden jump in sales), this reveals the figures that Defendants had been setting forth in QSGI's SEC filings for years to have been untrue.

16

51.     Despite having actual knowledge of this information, Defendants Sherman and

Cummings personally certified, under oath, the veracity of QSGI's SEC filings. Each of the

Company's 10Q and 10K filings contained the following certification from each of Sherman and

Cummings:

**CERTIFICATION**

I, Marc Sherman [or Edward Cummings], Chairman, Chairman of the Board and Chief
Executive Officer, certify that:

1.      I have reviewed this quarterly report on Form 10-Q of QSGI INC.;

2.      Based on my knowledge, this report does not contain any untrue statement of a
        material fact or omit to state a material fact necessary to make the statements made,
        in light of the circumstances under which such statements were made, not misleading
        with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information
        included in this report, fairly present in all material respects the financial condition,
        results of operations and cash flows of the registrant as of, and for, the periods
        presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and
        maintaining disclosure controls and procedures (as defined in Exchange Act Rules
        13a-15(e) and 15d-15(e)) for the registrant and internal control over financial
        reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the
        registrant and have:

        (a) designed such disclosure controls and procedures, or caused such disclosure
        controls and procedures to be designed under our supervision, to ensure that material
        information relating to the registrant, including its consolidated subsidiaries, is made
        known to us by others within those entities, particularly during the period in which
        this report is being prepared;

        (b) designed such internal control over financial reporting, or caused such internal
        control over financial reporting to be designed under our supervision, to provide
        reasonable assurance regarding the reliability of financial reporting and the
        preparation of financial statements for external purposes in accordance with generally
        accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 14, 2009      /s/ Marc Sherman_____

Marc Sherman
Chairman of the Board and Chief Executive Officer

52.     Despite providing these sworn certifications, both Sherman and Cummings knew that QSGI's SEC filings contained false and fraudulent information. Each of the other Defendants reviewed, and was likewise aware of, the false inventory figures in QSGI's filings.

53.     In total, using fabricated monthly borrowing base calculations, which the Defendants emailed weekly to Matthew Coad, of Victory Park – as bolstered by false and inflated inventory figures contained in QSGI's SEC filings – QSGI borrowed approximately $6.2 million in cash from Victory Park between July 2008 and June 2009. Every dollar of this loan encumbered CCSI's assets and stock because Victory Park claimed a first and second lien on

18

such assets and stock, respectively.

54.     In submitting false SEC filings, certifying their veracity and/or permitting such documents to be publicly filed with the SEC, Defendants committed fraud and breached their fiduciary duties of candor and loyalty to John Riconda, both as a stockholder of QSGI and as the Pledgee of CCSI's stock and assets under the Pledge and Escrow Agreement dated as of July 7, 2008. Riconda was damaged by this misconduct because every dollar borrowed by QSGI from Victory Park further encumbered collateral that had been pledged to him under the Pledge and Escrow Agreement.

55.     Defendants also included false receivables information in the monthly borrowing base calculations submitted to Victory Park. For example, in December 2008, QSGI submitted a $300,000 invoice for the sale of refurbished computers to a company known as Tiger Direct, which had remained on QSGI's accounts receivable list for over 90 days.

56.     The reason for the delay was that Tiger Direct had returned the computers to QSGI due to malfunctions. QSGI ultimately corrected the problems with the computers and subsequently re-shipped them to Tiger Direct together with a new invoice.

57.     Upon information and belief, however, in order to mislead Victory Park about the size of the borrowing base, and to enable QSGI to draw down cash under the financing transaction, Defendants Cummings and Sherman intentionally allowed both invoices to remain on QSGI's list of accounts receivable.

58.     In falsifying QSGI's borrowing base calculations, Defendants committed fraud and breached their fiduciary duties of candor and loyalty to John Riconda, both as a stockholder of QSGI and as the Pledgee of CCSI's stock and assets under the Pledge and Escrow Agreement

19

dated as of July 7, 2008. Riconda was damaged by this misconduct because every dollar borrowed by QSGI from Victory Park further encumbered collateral that had been pledged to him under the Pledge and Escrow Agreement dated July 7, 2008.

59.     At the same time, as set forth above, Sherman paid himself – and the other Defendants, as directors and officers of QSGI, approved – a yearly salary of $420,000, lining his own pockets to support his lavish lifestyle.

## 4.     QSGI Defaults On Its Payment Obligations To John Riconda And Forces Him To Engage In Protracted Litigation In Order To Reclaim CCSI, Causing Him Injury

### A.     QSGI Defaults On Its Payment Obligations To John Riconda

60.     As noted above, QSGI failed to make even a single quarterly interest payment to John Riconda pursuant to the Note, thus defaulting on its payment obligations to Riconda under the Note and pursuant to other July 7, 2008 transaction agreements. QSGI never subsequently or otherwise paid John Riconda any money for CCSI.

61.     QSGI's default could not have been clearer. The Note obligated QSGI to make quarterly interest payments to John Riconda, at an annual rate of 10%, "with the first installment due and payable on the first day of the month next following the date hereof [i.e., on August 1, 2008, the first day of the month following the July 7, 2008 closing of the transaction], and each installment thereafter due and payable on the first day each of July, October, January and April in each year ...." Note ¶ 3(a). (As set forth above, ¶ 3(e) of the Note provided that, "Upon the occurrence of an Event of Default," the interest rate becomes payable "at the default rate of 15% per annum." At the default rate, the quarterly payments owed to John Riconda total $375,000.)

62.     QSGI also failed to pay $120,000 in legal fees to Riconda's counsel, which it was

required to pay pursuant to the July 7, 2008 transaction documents, which Riconda therefore was required to pay. In fact, when Riconda urged Defendant Sherman to make the promised payment, Sherman stated – with reference to Riconda's counsel – "what are they going to do, sue us?"

63. Again, QSGI's breach of its contractual obligations could not have been more obvious. The First Amendment to the Stock Purchase Agreement between QSGI and John Riconda provided that, "One Hundred Seventy Thousand Dollars ($170,000.00), shall be paid to Meltzer, Lippe, Goldstein and Breitstone, LLP [i.e., John Riconda's counsel in the transaction], (i) as to Fifty Thousand Dollars ($50,000), by Buyer or QSGI at the Closing, and (ii) as to the balance, by the QSGI Parties as promptly as possible, but not later than July 31, 2008." Stock Purchase Agreement ¶ 2.3(a); First Amendment to Stock Purchase Agreement ¶ 3(f).

B.    The Riconda - QSGI Litigation And The Subsequent Settlement

64. There was, and never has been, a colorable factual dispute that QSGI failed to pay John Riconda for CCSI pursuant to the Note, or that QSGI was in default under the Note and other July 7, 2008 transaction documents.

65. Nevertheless, when John Riconda provided written notice to the escrow agent pursuant to ¶ 4.1.2 of the July 7, 2008 Pledge and Escrow Agreement, that an Event of Default had occurred under the Note – which he did on Wednesday, June 3, 2009 – and instructed the escrow agent to deliver to him the pledged stock of CCSI, Defendants baselessly disputed the default.

66. Pursuant to the Pledge and Escrow Agreement, the escrow agent could not release the stock of CCSI to Riconda if QSGI disputed the default (even with no explanation or excuse)

21

until a court of competent jurisdiction agreed that an Event of Default, as defined by the agreement, had in fact occurred. Thus, despite the fact that QSGI had not paid John Riconda a penny for the company it had "bought" from John Riconda (i.e., CCSI), Defendants forced John Riconda to litigate simply to reclaim the shares of CCSI that had been pledged to him as collateral.

67.     On June 10, 2009, John Riconda filed a complaint against QSGI and Victory Park in Supreme Court, New York County, seeking, among other relief, rescission of the sale transaction between QSGI and Riconda, consequential and punitive damages and an Order authorizing the escrow agent to deliver the stock of CCSI that had been pledged as collateral under the Pledge and Escrow Agreement to John Riconda. Riconda also sought a declaration that Victory Park's claimed lien on the assets of CCSI was void ab initio.

68.     Before QSGI filed an Answer to the Complaint, the company sought Chapter 11 protection in the Southern District of Florida, automatically staying the New York case pursuant to section 362(a) of the Bankruptcy Code.

69.     Thereafter, Riconda and CCSI appeared in the Bankruptcy proceeding (and were forced to incur expenses not only for payment of New York counsel, but of local counsel in Florida). John Riconda was listed as QSGI's second largest secured creditor.

70.     Initially, Debtor's counsel threatened to file a Chapter 11 petition for CCSI itself – which QSGI was still purporting to own at the time – but Riconda's and CCSI's counsel successfully prevented such a filing.

71.     Over the ensuing approximately 14 months, Riconda's lawyers worked to protect his interests in the Bankruptcy proceeding, appearing both in person and telephonically at

22

numerous hearings before Judge Erik Kimball.

72.     Ultimately, in June 2010, Riconda, CCSI and the Debtor (i.e., QSGI) entered into the settlement agreement that allowed Riconda to retake possession of the CCSI shares that had been in the custody of the escrow agent.

73.     In pertinent part, the settlement agreement provided that John Riconda's secured claim for nearly $11 million would be converted into an unsecured claim in the amount of $10,159,000, and that John Riconda would waive the right to any distributions from the $50,000 carve-out from QSGI's estate for unsecured creditors.  For its part, QSGI authorized the escrow agent to deliver CCSI's stock to John Riconda, and acknowledged that it claimed no lien or other advantage over CCSI's stock or assets.

C.     The Litigation With Victory Park And The Subsequent Settlement

74.     The settlement agreement between and among Riconda, CCSI and QSGI had no effect on Victory Park's claimed lien on CCSI's assets, or upon Victory Park's claim that CCSI was part of the jointly and severally liable debtor group that owed it approximately $6.2 million.

75.     As set forth above, John Riconda notified the escrow agent that QSGI had defaulted on its payment obligations to him under the Note and demanded that the pledged CCSI shares be delivered to him, on June 3, 2009.

76.     Two days later, On Friday, June 5, 2009, Victory Park sent a letter to John Riconda indicating that Victory Park intended to exercise its priority lien on CCSI's assets and threatening to take other legal action against CCSI and John Riconda personally.

77.     In addition, on Friday, June 5, 2009, Victory Park caused CCSI's operating bank account at Suffolk County National Bank to be frozen, preventing CCSI's payment of federal

payroll taxes and withholding, which was scheduled to be wired from the account at 9 a.m. on Monday, June 8, 2009. (John Riconda believed Victory Park's actions to be unauthorized but all claims between John Riconda and Victory Park have been settled, as described below).

78.     Because Victory Park had frozen CCSI's operating bank account at Suffolk County National Bank, Riconda was forced to open an operating account at another nearby bank in order to continue doing business and to meet CCSI's payroll and benefits obligations to its approximately 75 Suffolk County-based employees.

79.     Thereafter, Victory Park, which had retained Latham & Watkins LLP as its counsel, filed a "TRO Complaint" in Cooke County Circuit Court, in Chicago, Illinois against CCSI and John Riconda personally, seeking to compel CCSI to resume using the frozen Suffolk County National Bank Account. Although, the Court denied Victory Park's application for relief, Riconda's lawyers, together with local counsel in Chicago, worked on an expedited schedule to prepare extensive responsive legal papers and prepare for oral argument in opposition to Victory Park's action. Riconda incurred tens of thousands of dollars in legal fees in connection with Victory Park's application for a TRO alone.

80.     Notably, while the TRO was denied, Victory Park's Complaint was not dismissed. Thus, at the time of QSGI's Chapter 11 filing, Victory Park and Riconda had reciprocal complaints pending against one another in New York and Chicago state courts. In view of the Chapter 11 filing, counsel for the parties agreed, by stipulation, to have each of the cases transferred to the Bankruptcy Court in which the QSGI proceeding was being administered and to try Riconda's and CCSI's and Victory Park's respective claims against one another in that forum.

81.     The transfer process was cumbersome and time consuming, and again, caused Riconda to incur substantial legal fees. By way of example only, Victory Park's lawsuit against CCSI and Riconda was to be transferred from Illinois state court to Illinois federal court; then to Federal District Court in the Southern District of Florida; and then to the Bankruptcy Court for the Southern District of Florida. The transfer of Victory Park's case from the federal district court for the Southern District of Florida to the Bankruptcy Court was delayed, and Victory Park sought to circumvent the delay by moving to voluntarily dismiss the claim so that it could be re-filed in Chicago without naming the Debtor (i.e., QSGI) as a party.

82.     Riconda and CCSI viewed Victory Park's action as a breach of the parties' stipulation to try the parties' claims in the bankruptcy court, and opposed Victory Park's voluntary dismissal. Ultimately, the Court granted Victory Park's motion, but again Riconda and CCSI were forced to incur tens of thousands of dollars in legal fees in connection with that motion practice alone.

83.     Subsequently, in February 2010, Riconda and CCSI – who had also voluntarily dismissed their lawsuit against Victory Park – and Victory Park, whose claim was dismissed without prejudice, re-filed lawsuits against one another in New York state court and federal court in Chicago, respectively.

84.     Ultimately, neither Complaint was served because Victory Park and Riconda, through counsel, were actively engaged in settlement discussions. Those discussions culminated in a settlement agreement whereby Riconda agreed to a make a cash settlement payment to Victory Park and Victory Park agreed to relinquish all claimed liens on the stock and assets of CCSI.

85.     In total, as a direct and proximate cause of the Defendants' fraud and breaches of duty – which encumbered the collateral QSGI had pledged to John Riconda, and which Defendants had a fiduciary obligation to protect – Riconda was forced to spend in excess of $700,000 in legal fees on top of the settlement payment to Victory Park.

### FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty)

86.     Plaintiff repeats and realleges each and every allegation set forth at Paragraphs 1 through 85 as through more fully set forth herein.

87.     The Defendant directors and officers of QSGI owed John Riconda a fiduciary duty as a pledge under the Pledge and Escrow Agreement dated as of July 7, 2008 to protect the value of the pledged collateral – i.e., the stock and assets of CCSI.

88.     By drawing down funds under the Victory Park financing based on false information concerning the value of QSGI's inventory, which Defendants also reported in QSGI's public SEC filings, and which funds QSGI lacked the means to repay, the Defendants encumbered and diminished the value of CCSI's stock and assets, which collateralized the loans.

89.     The Defendants also breached their fiduciary duty by failing to prevent Defendant Sherman, and QSGI, from expanding the refurbishment and resale business with Keystone Memory Group and Tiger Direct, which Sherman financed by taking hundreds of thousands – if not millions – of dollars in loans from Victory Park, encumbering collateral that had been pledged to John Riconda. That business enriched Sherman and his family members personally, causing injury to QSGI and its shareholders, including John Riconda, both as a shareholder of QSGI, and as a pledgee under the Pledge and Escrow Agreement of July 7, 2008.

26

90. Defendant Sherman also breached his fiduciary duty to John Riconda by using money loaned by Victory Park to QSGI – every penny of which further encumbered John Riconda's collateral – to pay himself the huge salary of $420,000. The other defendants, as directors and officers of QSGI, breached their fiduciary duty to Riconda by approving that outsized compensation.

91. John Riconda was damaged by Defendants' misconduct by incurring massive legal fees and paying hundreds of thousands of dollars in settlement costs to Victory Park as a direct result of the Defendants' misconduct.

## SECOND CAUSE OF ACTION
### (Breach of the Duty of Loyalty)

92. Plaintiff repeats and realleges each and every allegation set forth at Paragraphs 1 through 91 as though more fully set forth herein.

93. The Defendants, as directors and officers of QSGI were bound by a duty of unqualified and undivided loyalty to QSGI which includes good faith efforts to ensure that they do not make personal profit is not at the expense of the corporation.

94. Defendant Sherman breached his Duty of Loyalty by engaging in outright self-dealing, buying used computers from his sister at Keystone Memory Group at inflated prices, and reselling them to Tiger Direct, at a massive loss to QSGI and its shareholders. The other Defendants breached their fiduciary Duty to QSGI and its shareholders, including John Riconda, by failing to prevent Sherman from expanding this disastrous line of business, despite his express promises to John Riconda to do so, and despite the other Defendants' actual awareness of the business's mounting losses and Sherman's promises to John Riconda to exit the refurbishment

27

and resale business.

95.     Sherman also breached his duty of loyalty by paying himself a salary of $420,000 per year to support his lavish lifestyle while driving QSGI into the ground and encumbering its assets – including the collateral that had been pledged to John Riconda under the Pledge and Escrow Agreement dated July 7, 2008. The other Defendants breached their duty of loyalty to QSGI and its shareholders, including John Riconda, by approving Sherman's outlandish compensation package.

96.     John Riconda suffered millions of dollars in injury as a result of the Defendants' misconduct consisting of approximately $1,372,602 in lost interest payments from QSGI, more than $700,000 in legal and other professional fees, and a $500,000 settlement payment to Victory Park.

THIRD CAUSE OF ACTION<br>(Fraud)

97.     Plaintiff John Riconda repeats and realleges each and every allegation set forth at Paragraphs 1 through 96 as though more fully set forth herein.

98.     As set forth with specificity above, Defendant Marc Sherman made numerous, specific fraudulent statements to John Riconda for the purpose of inducing Plaintiff Riconda to consummate the Transaction. Sherman and the other defendants also made false and fraudulent statements in QSGI's SEC filings both prior to and following the consummation of the QSGI – CCSI acquisition. Thereafter, Sherman and the other defendants made false and fraudulent statements in public SEC filings and borrowing base calculations that were provided to Victory Park for the purpose of drawing down cash, thereby encumbering John Riconda's collateral.

28

99.   The representations set forth above were false, and Defendants knew they were false at the time they were made.

100.   The representations were made by the Defendants to Plaintiff Riconda and to non-party Victory Park – which directly impacted Riconda -- with the intent that Riconda and Victory Park rely on those false and fraudulent representations.

101.   Plaintiff John Riconda and, upon information and belief, non-party Victory Park, in fact reasonably relied on the aforesaid representations, causing John Riconda injury. As set forth at above, John Riconda was damaged by Defendants' misconduct in that he was denied $$1,372,602 million in interest payments due under the Note, and he incurred massive legal fees and was required to pay hundreds of thousands of dollars in settlement costs simply to reclaim his company (i.e., CCSI).

29

**WHEREFORE,** Plaintiff John R. Riconda respectfully requests judgment against the Defendants consisting of an award of actual damages in an amount to be specifically determined at trial, but in no event less than $2,572,602, which comprises $1,372,602 in interest payments Riconda was owed, but never received, under the Note and approximately $1.2 million in legal fees and settlement costs incurred by John Riconda in litigation with QSGI and Victory Park. Riconda also respectfully requests an award of punitive damages against the Defendants in an amount to be determined by the Court, but in no event less than the $2,572,602 million of actual damages suffered by John Riconda, together with such other and further relief as the Court deems just and proper.

Dated: New York, New York
       February 25, 2011

KELLEY DRYE & WARREN LLP

By: _____
Joshua A. Berman
101 Park Avenue
New York, NY 10178
(212) 808-7800

*Attorneys for John R. Riconda*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
Index No. 006678/2011

JOHN R. RICONDA,

Plaintiff,

-against-

MARC SHERMAN, EDWARD L. CUMMINGS,
ROBERT W. VAN HELLEMONT, R. KEITH
ELLIOT, JOHN F. CUNNINGHAM, AND GEOFF
SMITH,

Defendants.

SUMMONS & COMPLAINT

KELLEY DRYE & WARREN LLP
101 PARK AVENUE
NEW YORK, NY 10178

(212) 808-7800